Filed 3/23/21  In re Emmanuel D. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re EMMANUEL D. et al., Persons Coming Under the Juvenile Court Law. | B305003 (Los Angeles County Super. Ct. No. 19CCJP04710A-C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. STACI D., Defendant and Appellant. | |

APPEAL from findings and orders of the Superior Court of Los Angeles County, Stephen C. Marpet, Judge Pro Tempore. Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, and William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Appellant Staci D. (mother) appeals from the juvenile court's jurisdictional findings and dispositional orders in which three of her children—Emmanuel D. (Emmanuel, born 2006), Harmoney H. (Harmoney, born 2005), and Jameil B. (Jameil, born 2004) (collectively minors)—were adjudicated dependents of the court and removed from her custody. She contends that substantial evidence did not support the jurisdictional findings or the removal orders.

We affirm.

## BACKGROUND

I. *The Family*

Mother has a total of 12 children. This appeal concerns dependency proceedings brought on behalf of her three youngest children: Emmanuel, Harmoney, and Jameil. Minors' fathers are not parties to this appeal.

II. *Referral*

In July 2019, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging

2

general neglect of Emmanuel by mother, with several of his siblings also at risk.[1]

On the night of July 18, 2019, mother brought Emmanuel, who has sickle cell anemia, to the emergency room for pain. Mother was upset about several incidents at the hospital. The reporting party suspected that mother was under the influence because she was incoherent and at times would fall asleep while talking to hospital staff. Mother had not been taking her psychiatric medication.

III. *Initial Investigation*

In response to the referral, DCFS social worker Steven Claxton (CSW Claxton) interviewed hospital staff and mother on July 22, 2019.[2]

A. Statements by hospital staff

Dr. Sara Gustafson stated that mother had allowed a blood sample to be taken from Emmanuel on July 19, 2019, to check for a bacterial infection. No infection was detected at that time. Since then, mother had only allowed blood draws to check Emmanuel's white blood cell count, which was abnormally high. He also had a high fever. He was currently taking an antibiotic, but his condition did not appear to be improving. Another type of blood test needed to be performed to determine what type of infection he had. Mother was refusing to allow hospital staff to obtain a blood culture sample or administer a new antibiotic.

---

[1]  Between 1999 and 2019, DCFS received at least 26 child welfare referrals regarding the family.

[2]  Mother did not allow CSW Claxton to speak with Emmanuel or complete a body check.

According to Dr. Gustafson, Emmanuel's life was at risk by not receiving appropriate medical treatment.

Dr. Lynne Smith reported that Emmanuel was facing a life or death situation if he did not receive appropriate medical care and that mother was preventing the delivery of such care. Dr. Smith and other hospital staff had explained to mother the importance of giving Emmanuel vancomycin, an antibiotic, to reduce his fever. Mother was delaying Emmanuel's medical treatment at a time when he could possibly die by the morning.

Dr. Brian Hernandez reported that mother had been cooperative with medical treatment until that day (July 22, 2019). He had explained to mother the importance of Emmanuel receiving additional medical treatment, including an ultrasound, but mother was not receptive.

A supervising social worker stated that she had explained to mother that Emmanuel was in need of a higher level of care in order to improve. Mother continued to withhold her consent to any other medical treatment.

According to another social worker, mother had disclosed that she had a history of trauma and had been diagnosed with posttraumatic stress disorder (PTSD). Mother was no longer taking her psychotropic medication.

B. Statements by mother

Mother told CSW Claxton that Emmanuel was not receiving proper treatment and that she wanted him transported to a different hospital. She believed that hospital staff had mishandled Emmanuel's blood samples and placed him in the wrong room.

Asked about falling asleep during conversations and being incoherent while speaking with hospital staff, mother denied

4

being under the influence of any substance or using drugs or alcohol. Regarding why she was refusing to allow the hospital staff to give minor vancomycin, mother continued to voice her complaints about the hospital.

Mother refused to allow any other treatment to be administered to Emmanuel and stated it was her right as a parent to have him transferred to another hospital.

Mother stated that she had a history of mental health issues and had been diagnosed with PTSD after her brother's murder eight years before. She previously took Seroquel but had stopped taking it the previous year because she did not feel that she needed it.

IV. *Orders to Remove Emmanuel and for Medical Treatment*

On July 23, 2019, DCFS sought and was granted orders removing Emmanuel from mother's custody and authorizing DCFS to secure medical treatment for him.

Mother refused to accept the removal order when it was served on her that same day. She claimed that there was nothing wrong with Emmanuel. Due to an issue with the seal on the order, law enforcement declined to remove mother from the hospital, and she continued to interfere with Emmanuel's medical treatment. While she allowed hospital staff to give him one dose of a new antibiotic, she later refused to allow a second dose and paused the machine administering the medication. She also refused to allow x-rays to be taken. CSW Claxton served mother with the order again, and law enforcement eventually removed her from the hospital.

An echocardiogram revealed that Emmanuel had dilated cardiomyopathy and pulmonary hypertension.

V. *Interviews with the Family*

On July 23, 2019, mother told DCFS supervising social worker Virginia Liechty Perez (SCSW Perez) that she did not understand why Emmanuel had been detained. Mother denied preventing Emmanuel from receiving medical treatment and said that she was going to file a complaint because the hospital was "testing Emmanuel for 'parvo.'" Mother stated, "'Parvo[] is for dogs!'"

Mother agreed to allow SCSW Perez to meet with Jameil and Harmoney on a sidewalk but would not provide her home address. Both Jameil and Harmoney were appropriately dressed, clean, and free of visible marks or bruises.

Jameil did not understand why mother could not see Emmanuel. Jameil stated that mother took good care of Emmanuel and him. He was not aware if mother was on any medication, but he denied that she used drugs or alcohol. SCSW Perez observed Jameil to be guarded in his responses regarding mother's mental health. According the Jameil, the family lived in a three-bedroom home. There was always food in the home, and he felt safe there. He denied any abuse.

Harmoney said that mother always took Emmanuel to the doctor when he was ill. She was unaware of mother having any mental health issues and denied that mother used substances, including alcohol. She said that she always had food to eat and denied any abuse. When asked to describe mother, Harmoney responded, "'She's about love. She's a love person.'" Harmoney felt safe and "'love[d]'" living with mother. SCSW Perez thought that Harmoney appeared guarded and frequently looked in mother's direction when asked a question.

6

Following her interviews with Jameil and Harmoney, SCSW Perez spoke with mother again. Mother brought out several documents, scattered them all over, and began erratically sorting through them. She claimed that the order removing Emmanuel from her custody was invalid and that all the signatures were forged. She stated that she was going to arrest everyone involved and would go to court immediately. Mother was displaying odd body language, which suggested to SCSW Perez that she might have been under the influence of a substance. When asked if she would drug test, mother refused and said that she did not use drugs.

The following day, on July 24, 2019, mother called SCSW Perez. Mother's speech was slurred, making her difficult to understand. Mother became combative when asked about the whereabouts of another minor who had been listed as her child. Even though mother had previously stated that the minor was her grandson, she denied knowing him to SCSW Perez.

VI. *Dependency Petition*

On July 25, 2019, DCFS filed a dependency petition seeking the juvenile court's exercise of jurisdiction over Emmanuel. Brought pursuant to Welfare and Institutions Code section 300, subdivision (b)(1) (failure to protect),[3] the petition alleged two counts against mother.

For the b-1 count, the petition alleged that Emmanuel suffered from sickle cell anemia, dialated cardiomyopathy, pulmonary hypertension, and a high fever. His medical condition was life threatening and required immediate medical care. Mother refused to consent to and interfered with medical

---

[3]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

7

treatment for Emmanuel.  Mother's medical neglect endangered Emmanuel's physical health and safety and placed him at risk of serious physical harm.

For the b-2 count, the petition alleged that mother "demonstrate[d] mental and emotional problems," which rendered her incapable of providing regular care for Emmanuel. Mother failed to take her psychotropic medication as prescribed. Mother's mental and emotional problems endangered Emmanuel's physical health and safety and placed him at risk of serious physical harm.

VII. *Detention Hearing*

At the detention hearing on July 26, 2019, the juvenile court found that a prima facie showing had been made that Emmanuel was a person described by section 300 and that the initial detention order was justified.  The court found that further detention was necessary.  Mother was granted monitored visitation.

VIII. *Detention of Jameil and Harmoney*

Mother failed to show up for a scheduled interview with a dependency investigator on August 6, 2019.  The following day, during a telephone call with CSW Claxton, mother refused to drug test or complete a mental health assessment.

CSW Claxton spoke with mother on the phone on August 20, 2019.  CSW Claxton asked if he could meet with mother, Jameil, and Harmoney in person.  Mother refused. Mother also refused to allow CSW Claxton to speak with Jameil and Harmoney on the phone.

On August 21, 2019, CSW Claxton received a phone call from one of minors' adult siblings.  The adult sibling reported that she was at a police station filing a missing persons report for

Jameil and Harmoney. They had spent the previous night with her, but she did not know where they were currently. She stated that mother "ha[d] been making it difficult for everyone" by blaming them for the removal of Emmanuel. Mother would arrive, unannounced, at the home of another adult sibling, with whom Emmanuel had been placed.[4]

CSW Claxton spoke with mother on the phone regarding the whereabouts of Jameil and Harmoney. Mother stated that they were with her at the police station. But about five minutes later, the adult sibling who had initially called CSW Claxton about filing missing persons reports stated that Jameil and Harmoney had not been present with mother.

Later on August 21, 2019, CSW Claxton received a phone call from Jameil and Harmoney. They stated that they no longer wanted to be with mother but declined to elaborate.

On August 23, 2019, the juvenile court found that continuance in the home of mother was contrary to Jameil and Harmoney's welfare and ordered them to be detained under DCFS supervision.

Despite the detention order, the whereabouts of Jameil and Harmoney remained unknown. On August 27, 2019, the juvenile court issued a protective custody warrant for Jameil and Harmoney and a no bail arrest warrant for mother.[5]

---

[4] Emmanuel was discharged from the hospital and placed in the home of one of his adult siblings on August 1, 2019.

[5] The warrants were recalled on September 9, 2019, after Harmoney and Jameil were located.

IX. *Mother's Altercation with Harmoney*

On August 31, 2019, Harmoney and Jameil were living with mother at a hotel. They no longer wanted to live there and called one of their adult siblings to be picked up. As they were collecting their belongings, mother grabbed Harmoney by the shoulder because she did not want her to leave. Mother grabbed Harmoney's neck and waist, and they fell down together. Mother wrapped her legs around Harmoney and squeezed her waist. In pain, Harmoney started crying. Harmoney told mother to stop and to let go. Harmoney was eventually taken to the hospital.

Harmoney and Jameil were subsequently placed with adult siblings under DCFS supervision. They reported to a DCFS social worker "that although they love their mother, they 'do not like the drama that comes with living with mom.'"

X. *First and Second Amended Petitions*

On October 22, 2019, DCFS filed a first amended petition regarding Emmanuel, as well as Jameil and Harmoney.

The first amended petition included slightly amended versions of the allegations in the original petition regarding mother's interference with Emmanuel's medical treatment and her mental and emotional problems. These allegations were used to support the b-1 and b-2 counts under section 300, subdivision (b)(1) (failure to protect), and the j-1 and j-2 counts under subdivision (j) (abuse of sibling).

It was also alleged that mother physically abused Harmoney by forcefully grabbing her shoulder and choking her. This excessive physical abuse caused Harmoney unreasonable pain and suffering. These allegations were used to support the a-1 count under section 300, subdivision (a) (nonaccidental serious

physical harm), the b-3 count under subdivision (b)(1), and the j-3 count under subdivision (j).

On January 14, 2020, DCFS filed a second amended petition to correct a typographical error as to the date of the physical abuse allegations.

XI. *Last Minute Information for the Court*

On January 13, 2020, DCFS reported that minors had "continued to thrive in their respective placements with their adult siblings." Minors were attending school and scheduled doctor appointments. They wanted to continue residing with adult siblings.

DCFS social workers had attempted to complete a visitation schedule with mother, but mother impeded their efforts. Mother would talk over the social workers and digress into irrelevant topics. Mother had a tendency to arrive at the DCFS office unannounced and demand immediate visitation.

Mother had a monitored visit with Emmanuel in December 2019. She arrived with a birthday cake for him. She spoke to Emmanuel about the dependency case, "voicing her frustration." Emmanuel appeared embarrassed when mother pulled up his shirt to show the social worker an old scar.

Mother had shown the dependency investigator a recent treatment plan from the Department of Mental Health. The plan indicated that mother had been diagnosed with PTSD in December 2014. Mother was scheduled to attend individual therapy once a month.

XII. *Adjudication Hearing*

Mother attended and testified at the adjudication hearing held on January 15, 2020. She repeated many of her previous statements about allegedly poor treatment at Harbor-UCLA

Medical Center.  She denied ever using physical discipline on her children.  She stated that she had been diagnosed with PTSD in 2014.  She took medication for a few years and then stopped.  As of December 2019, she was taking Seroquel and Benadryl.  She was seeing a therapist and planned to continue taking her medication.

After entertaining oral argument, the juvenile court dismissed the allegations of medical neglect of Emmanuel and physical abuse of Harmoney pled under counts a-1, b-1, b-3, j-1, and j-3.  The court sustained the b-2 and j-2 counts regarding mother's mental health issues.[6]  The court told mother:  "I think there's no question that mental health in your life is a significant issue . . . as a result of the death of your brother and it manifests itself when issues occur that are traumatic to you . . . .  I think that this diagnosis is appropriate.  It doesn't go away because you're taking medication."

The juvenile court also found, by clear and convincing evidence, that there was a substantial danger to minors' physical and mental wellbeing if they were not detained from mother and that there were no reasonable means to protect them absent removal.  The court ordered reunification services, including

---

[6]  The sustained allegations under section 300, subdivisions (b) and (j), state that mother "demonstrates mental and emotional problems, including a diagnosis of [PTSD], which render the mother incapable of providing regular care of the child.  The mother failed to take the mother's psychotropic medication as prescribed.  Such mental and emotional problems on the part of the mother endanger the child's physical health and safety and place the child at risk of serious physical harm, damage and danger."

individual counseling for mother and minors. Mother was granted monitored visits.

When mother stated that she felt that her children had "been kidnapped" and that she had been told that they would be returned if she took medication, the juvenile court responded: "It doesn't happen overnight. Mental health is not something that goes away because you start taking a pill. It's something that I need to make sure . . . you're taking it consistently, treating the children appropriately, not doing things that are inappropriate so that I can get these children back to you sooner rather than later."

XIII. *Appeal*

Mother filed a timely notice of appeal from the dispositional orders removing minors from her custody, as well as the underlying section 300 jurisdictional findings.

XIV. *Subsequent Events*

On October 14, 2020, during the pendency of this appeal, the juvenile court found that mother had made substantial progress toward alleviating or mitigating the issues that had necessitated the removal of minors. The court ordered minors to be placed with mother under DCFS supervision and for the family to receive family maintenance services.[7]

---

[7] DCFS moves for judicial notice of (1) the last minute information for the court (LMI) filed on September 2, 2020; (2) the LMI filed on September 8, 2020; (3) the LMI filed on October 1, 2020; (4) the LMI filed on October 7, 2020; and (5) the juvenile court's minute orders dated October 14, 2020. We grant the unopposed motion and take judicial notice of the LMIs and minute orders pursuant to Evidence Code section 452, subdivisions (c) and (d).

13

# DISCUSSION

## I. *Jurisdictional Findings*

Mother argues that insufficient evidence supports the jurisdictional findings under section 300, subdivisions (b)(1) and (j).

### A. Applicable law and standard of review

Under section 300, subdivision (b)(1), the juvenile court has jurisdiction over and may adjudge to be a dependent of the court a "child [who] has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness . . . by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness . . . ." Jurisdiction also extends, under section 300, subdivision (j), to a child whose "sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions."

Although "'[h]arm to a child cannot be presumed from the mere fact the parent has a mental illness[]'" (*In re Travis C.* (2017) 13 Cal.App.5th 1219, 1226), a parent's mental illness and failure to consistently treat it may place a child at substantial risk of serious physical harm. (*Id.* at pp. 1226–1227.) "It is not necessary for DCFS or the juvenile court to precisely predict *what* harm will come to [a child] . . . . Rather, it is sufficient that [the parent's] illness and choices create a substantial risk of *some* serious physical harm or illness." (*Ibid.*)

Jurisdictional findings must be made by a preponderance of the evidence. (§ 355, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248.) We review those findings for substantial evidence—"evidence that is reasonable, credible and of solid value. [Citations.] We do not evaluate the credibility of

14

witnesses, attempt to resolve conflicts in the evidence or determine the weight of the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is other evidence supporting a contrary finding." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843 (*R.V.*).)

B. <u>Analysis</u>

The record contains ample substantial evidence that mother's mental illness endangered minors through her erratic behavior, unfocused thinking, and impaired judgment during times of stress.

During Emmanuel's hospitalization in July 2019, mother interfered with and delayed life-saving treatment. Despite being told numerous times by hospital staff that Emmanuel's condition was life-threatening and required different antibiotics and diagnostic tests, she refused to consent to such treatment. At one point she allowed Emmanuel to receive one dose of a new antibiotic, but she later paused the machine administering the second dose. She remained fixated on her complaints about the hospital and was seemingly unable to process the urgency and severity of Emmanuel's condition. The juvenile court could reasonably infer that, if Jameil and Harmoney faced a medical emergency, they too would be subject to mother's failure to respond adequately to their needs.

Following the removal of Emmanuel from her custody, mother created an unstable home environment for Jameil and Harmoney. This culminated in a chaotic period during which mother refused to allow DCFS to talk to Jameil and Harmoney and one of minors' adult siblings felt compelled to file a missing persons report about them. Their whereabouts remained

unknown even after a detention order was issued. Later, when they attempted to leave the place they were staying with mother by reaching out to one of their adult siblings, mother's reaction was to engage in a physical altercation with Harmoney. This further demonstrates a link between mother's behavior and a risk of physical harm to minors.

We reject mother's various arguments that substantial evidence was lacking.

First, mother amplifies portions of the record arguably favorable to her position while ignoring other evidence and alternative interpretations. She points to minors' positive comments about her parenting and characterizes herself as a great advocate for Emmanuel's medical needs. Meanwhile, she does not engage with the substantial evidence based on statements by numerous hospital staff indicating that her unreasonable conduct placed Emmanuel's life at risk.

Mother's position cannot be harmonized with the substantial evidence standard of review. We are required to view the evidence in the light most favorable to the juvenile court's findings, and we may not reweigh the evidence. (*R.V.*, *supra*, 208 Cal.App.4th at p. 843.) Having identified substantial evidence supporting the jurisdictional findings, "it is of no consequence" that other evidence or inferences drawn from the evidence might have supported a different finding by the juvenile court. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874.)

Second, mother argues that, by the time the juvenile court made its jurisdictional findings, she had resumed taking her medication and was seeing a therapist.

It is certainly true that, "[w]here jurisdictional allegations are based solely on risk to the child, and not on past injury, a

16

juvenile court ordinarily determines whether a substantial risk of harm exists at the time of the jurisdiction hearing[.]" (*In re J.M.* (2019) 40 Cal.App.5th 913, 921.) Here, however, the juvenile court could reasonably infer that mother's mental health issues— and the substantial risk those issues posed to minors—were not sufficiently resolved and that dependency jurisdiction was justified. As the court observed, resolution of mental health issues "doesn't happen overnight." While mother had begun to take positive steps toward managing her mental health issues, the strong possibility remained that she could abruptly stop. After all, mother admitted to previously discontinuing her psychotropic medication simply because she did not feel that she needed it, demonstrating a failure to consistently treat her mental illness. Accordingly, the risk to minors persisted.

Third, mother's reliance on *In re Joaquin C.* (2017) 15 Cal.App.5th 537 (*Joaquin C.*) and *In re A.L.* (2017) 18 Cal.App.5th 1044 (*A.L.*) is misplaced, as those cases are readily distinguishable.

In *Joaquin C.*, the Court of Appeal concluded that a jurisdictional finding under section 300, subdivision (b), based on a parent's mental illness was not supported by substantial evidence. (*Joaquin C.*, *supra*, 15 Cal.App.5th at p. 540.) "The evidence was uncontroverted that [the minor] was healthy, well cared for, and loved, and that [the parent] was raising him in a clean, organized home with family support." (*Id.* at p. 562.) No evidence had been produced that the parent "had ever failed to adequately supervise or protect [the minor]; that she had ever failed to provide him with adequate food, clothing, shelter, or medical treatment; or that she had ever demonstrated an

17

inability to provide regular care to him because of her mental illness." (*Ibid*.)

Similarly, in *A.L.*, the Court of Appeal reversed, due to insufficient evidence, jurisdictional findings based on a parent's mental illness. (*A.L.*, *supra*, 18 Cal.App.5th at p. 1046.) The record contained no evidence that the minors had suffered actual harm or had been abused. (*Id*. at p. 1049.) And, there was an insufficient risk of future harm because the parent had undergone, and was continuing, significant treatment. Any risk was further mitigated by a strong family support system, including strong efforts made by the minors' other parent. (*Id*. at pp. 1050–1051.)

Here, as detailed above, substantial evidence exists that mother's mental illness placed minors at risk of serious physical harm. That risk was not adequately mitigated by her recent resumption of treatment or the degree of family support provided by her adult children. This case cannot be analogized to *Joaquin C.* and *A.L.*, where the risk of harm was inferred merely from the fact that a parent had mental illness.

II. *Dispositional Orders Removing Minors*

Mother also challenges the evidentiary basis for the dispositional orders removing minors from her custody.

A. <u>Mootness</u>

As an initial matter, we address DCFS's contention that mother's challenge to the removal orders is moot because minors were subsequently returned to her custody. (See *In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1315 ["When no effective relief can be granted, an appeal is moot and will be dismissed"].)

Mother argues that we should resolve this issue on the merits because minors' return did not toll the statutory time for

reunification services, which are generally "available to parents for a maximum of 18 months from the physical removal of the children from their home." (*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1251; see also *In re Zacharia D.* (1993) 6 Cal.4th 435, 446 ["The reunification period is expressly *not* tolled by the parents' physical custody of the child"].) If minors were to be removed again, she could be denied additional services based on the expiration of the reunification period.

Given that jurisdiction in this dependency matter continues and that mother has identified how the removal orders could have an adverse effect on future proceedings, we exercise our discretion to consider mother's challenge to those orders. (See *In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1404 ["We decide on a case-by-case basis whether subsequent events in a juvenile dependency matter make a case moot and whether our decision would affect the outcome in a subsequent proceeding"].)

B.  Applicable law and standard of review

Before removing a minor from a parent's custody, the juvenile court is required to "make one of five specified findings by clear and convincing evidence. (§ 361, subd. (c).) One ground for removal is that there is a substantial risk of injury to the child's physical health, safety, protection or emotional well-being if he or she were returned home, and there are no reasonable means to protect the child. (§ 361, subd. (c)(1).) "'Clear and convincing" evidence requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind. [Citations.]' [Citation.] Actual harm to a child is not necessary before a child can be removed. 'Reasonable apprehension stands as an accepted basis for the

19

exercise of state power.'" (*In re V.L.* (2020) 54 Cal.App.5th 147, 154 (*V.L.*).)

We review a dispositional order removing a minor from parental custody for substantial evidence. (*V.L.*, *supra*, 54 Cal.App.5th at p. 154.) The juvenile court must make its finding that a ground for removal exists under the clear and convincing evidence standard of proof. (§ 361, subd. (c).) Therefore, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)

C. <u>Analysis</u>

The same evidence that supports the juvenile court's exercise of dependency jurisdiction also constitutes substantial evidence from which the juvenile court could find it highly probable that minors would be at risk of substantial danger if they were returned to mother. (§ 361, subd. (c)(1).)

Urging us to reverse, mother argues that there was no risk to minors because she was participating in mental health services at the time of the adjudication hearing. As we have already discussed in the context of the jurisdictional findings, when the removal orders were made mother had only recently begun a treatment plan, including taking psychotropic medication. The juvenile court could reasonably find that such steps did not instantaneously remove the risk that mother's mental health problems posed to minors. As the court explained, it needed to ensure mother was taking her medication consistently and "treating the children appropriately[.]"

20

## DISPOSITION

The juvenile court's jurisdictional findings and dispositional orders are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
ASHMANN-GERST

We concur:


_____, J.
CHAVEZ


_____, J.
HOFFSTADT